## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| W.A., the student, and C.A. and<br>E.A., the student's parents,<br><br>Plaintiffs/Counter-Defendants,<br><br>v.<br><br>CLARKSVILLE/MONTGOMERY<br>COUNTY SCHOOL SYSTEM,<br><br>Defendant/Counter-Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Case No. 3:23-cv-00912**<br>     **Judge Aleta A. Trauger** |

## MEMORANDUM

      W.A.,[1] C.A., and E.A. have filed a Motion to Enforce Final Order of the Administrative Law Judge (Doc. No. 19), to which the Clarksville/Montgomery County School System ("CMCSS") has filed a Response (Doc. No. 23), and W.A., C.A., and E.A. have filed a Reply (Doc. No. 24). CMCSS has filed a Motion for Judgment on the Administrative Record (Doc. No. 21), to which W.A., C.A., and E.A. have filed a Response (Doc. No. 25). Finally, W.A., C.A., and E.A. have filed a Motion for Judgment on the Administrative Record, Including Motion to Admit Two Additional Pieces of Evidence (Doc. No. 22), to which CMCSS has filed a Response (Doc. No. 26). For the reasons set out herein, the plaintiffs' Motion for Judgment on the Administrative Record will be granted in part and denied in part, CMCSS's Motion for Judgment on the Administrative Record will be denied, and the plaintiffs' Motion to Enforce Final Order will be denied as moot.

---

[1] The student plaintiff in this case is referred to with different abbreviations of his name in different parts of the record. The court will use "W.A."

# I. BACKGROUND

## A. The IDEA and the Say Dyslexia Act

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). "[T]he IDEA gives the 'primary responsibility . . . for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies"— commonly referred to as "SEAs" and "LEAs"—which work "in cooperation with the parents or guardian of the child." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)).

The IDEA defines "FAPE" to include "both 'special education' and 'related services.' 'Special education' is 'specially designed instruction . . . to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child . . . to benefit from' that instruction." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)). Special education and related services must meet four general requirements before they can be said to qualify as providing a child with a FAPE. *See* 20 U.S.C. § 1401(9). The first three of those requirements are that the education and services "must be provided at public expense, must meet the State's educational standards, [and] must approximate the grade levels used in the State's regular education." *Rowley*, 458 U.S. at 203. The fourth requirement—identified by the Supreme Court as the "centerpiece of the statute's education delivery system for disabled children," *Honig v. Doe*, 484 U.S. 305, 311 (1988)—is that the child's

education must be "provided in conformity with the individualized education program ['IEP']" responsive to that child's disability and circumstances. 20 U.S.C. §§ 1401(9)(D), 1414(d). The IEP requirement provides "the means by which special education and related services are 'tailored to the unique needs' of [that] particular child." *Endrew F.*, 580 U.S. at 391 (quoting *Rowley*, 458 U.S. at 181).

That IEP requirement, with its focus on individualization, recognizes that what constitutes a FAPE may vary from child to child. The other FAPE requirements, however, leave room for another type of variation—based not solely on the needs of the child at issue, but also on the policy baseline set by the relevant state's educational system. The Sixth Circuit has held that, because the IDEA requires a FAPE to meet state educational standards, a school district that otherwise "complies with federal law, . . . may still violate the [IDEA] if it fails to satisfy more extensive state protections that may also be in place." *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993) (quoting *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990); citing *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 417 (1st Cir. 1985); *Geis v. Board of Educ. of Parsippany-Troy Hills*, 774 F.2d 575, 581 (3rd Cir. 1985)). For example, Tennessee has enacted specific legislation, the Special Education Behavioral Supports Act ("SEBSA"), Tenn. Code Ann. § 49-10-1301 to -1307, to govern the use of restraints and isolation in the special education setting. Based on the IDEA's assimilation of state standards, federal courts have held that a violation of SEBSA can also give rise to a violation of the IDEA. *See, e.g.*, *I.L. ex rel. Taylor v. Knox Cty. Bd. of Educ.,* 257 F. Supp. 3d 946, 964 (E.D. Tenn. 2017); *accord J.M. ex rel. Mata v. Tennessee Dep't of Educ.*, 358 F. Supp. 3d 736, 744–47 (M.D. Tenn. 2018).

In 2016, the Tennessee General Assembly enacted, and the Governor signed, a piece of legislation sometimes referred to as the "Say Dyslexia Act," 2016 Tenn. Pub. Laws ch. 1058 (S.B.

2635), *codified, as amended*, Tenn. Code Ann. § 49-1-229. The Say Dyslexia Act directs the Tennessee Department of Education ("TDOE") to "develop procedures for identifying characteristics of dyslexia through the universal screening process required by" the state's preexisting "Response to Instruction and Intervention" framework, which is often referred to as "RTI[2]." Tenn. Code Ann. § 49-1-229(a), (f)(2). "RTI[2] is an 'academic three-tiered framework'" that calls on educators "to intervene when students first start to struggle and to subsequently address deficits in student learning so that students can avoid prolonged academic difficulties." *Matthew B. ex rel. G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:22-CV-00675, 2023 WL 4633905, at *13 n.18 (M.D. Tenn. July 19, 2023) (quoting TDOE materials). The RTI[2] framework is intended to assist any students in need of intervention, including students receiving a general education who do not have any IDEA-covered disability. *See* Tenn. Code Ann. § 49-6-311.

The dyslexia screening required by the Say Dyslexia Act is mandatory for all Tennessee LEAs. Tenn. Code Ann. § 49-1-229(a)(3). If a student is found, by that process, to have "characteristics of dyslexia," then the LEA must:

(1) Notify the student's parent or legal guardian;

(2) Provide the student's parent or legal guardian with information and resource material regarding dyslexia;

(3) Provide the student with appropriate tiered dyslexia-specific intervention through its RTI[2] framework; and

(4) Monitor the student's progress using a tool designed to measure the effectiveness of the intervention.

Tenn. Code Ann. § 49-1-229(c). The Act defines "dyslexia-specific intervention" as follows:

"Dyslexia-specific intervention" means evidence-based, specialized reading, writing, and spelling instruction that is multisensory in nature, equipping students to simultaneously use multiple senses, such as vision, hearing, touch, and movement. Dyslexia-specific intervention employs direct instruction of systematic and cumulative content, with the sequence beginning with the easiest and most

4

basic elements and progress methodically to more difficult material. Each step must also be based on those already learned. Components of dyslexia-specific intervention include instruction targeting phonological awareness, sound symbol association, syllable structure, morphology, syntax, and semantics . . . .

Tenn. Code Ann. § 49-1-229(f)(1). TDOE's regulations implementing the Say Dyslexia Act require individualized, dyslexia-focused learning plans for students identified as dyslexic, but they exempt students with IEPs under the IDEA from that requirement. Tenn. Comp. R. & Regs. 0520-01-22-.02(f). Neither the Act nor the regulations, however, expressly exempt IDEA-eligible students from any other aspect of the Say Dyslexia Act's framework.

### B. W.A.'s Education and IEPs

W.A. is a CMCSS student who was in 12th grade for the 2023–2024 school year. (Administrative Record ("A.R."), Vol. 1 at 396.[2]) W.A. and his parents—E.A. and C.A.—moved to Clarksville around the time of the 2016–17 school year, when he was in fifth grade. (*Id.* at 381.) CMCSS, as a school system covered by the IDEA, has an obligation to take appropriate steps to identify students with disabilities pursuant to what is typically referred to as the IDEA's "child find" obligation. See 20 U.S.C. § 1412(a)(3); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). CMCSS's initial evaluation of W.A. showed significant deficits in reading and writing, and W.A. was identified as having an IDEA-covered learning disability, although he was not identified specifically as being dyslexic or potentially so. (A.R., Vol. 1 at 381.)

W.A.'s 2016–17 IEP identified his "Primary Disability" as a "Specific Learning Disability," with a "Secondary Disability" of "Language Impairments." (A.R., Vol. 2 at 683.) The

---

[2] Although each party disagrees with aspects of the ALJ's analysis and conclusions in this case, they mostly accept the ALJ's account of the foundational facts. The court will, therefore, cite the ALJ's findings for some background facts. The court's conclusions, however, are based on the administrative record as a whole.

IEP set language-related goals for W.A., granted him some accommodations (such as additional time for test taking), and established that he was to receive ninety minutes of speech/language therapy per week with a speech pathologist, as well as a combined six hours per week of interventional instruction with a special education resource teacher, consisting of two hours devoted to "Reading Intervention," two hours devoted to "Writing Intervention," and two hours devoted to "Math Intervention." (*Id.* at 689–96.) At the time that the IEP was formulated, W.A. was capable of writing about 40 words per minute in response to a writing prompt, with an average of 28 words spelled correctly. The average fifth grader, according to the IEP, could write about 51 words per minute, spelling 48 correctly. (*Id.* at 686.) The IEP acknowledged that W.A. faced issues not only with more advanced areas such as "Reading Fluency" and "Written Expression," but also "Basic Reading Skills." (*Id.* at 684–85.)

W.A.'s subsequent middle school IEPs were broadly similar in terms of the services provided, at least on their face. He continued to exhibit significant language deficits—for example, testing in the 1st percentile of metrics measuring reading fluency and the 10th percentile for written. (*Id.* at 704–05.) The IEPs' identifications of his deficits, however, began to omit any acknowledgment of a specific deficit related to basic reading skills, while continuing to note his deficits in fluency and comprehension. (*Id.* at 703–10, 723, 726–30, 741, 744–46.)

W.A.'s 2020–21 ninth grade IEP continued the approach of focusing on fluency and expression, rather than foundational skills. (*Id.* at 776–87.) The special education teacher assigned to W.A., however, quickly became what she described, in an email exchange with a school psychologist, as "very concerned" about W.A. In one internal email, the teacher stated bluntly that "[t]his kid can't read." (A.R., Vol. 1 at 387–88, A.R., Vol. 2 at 812.) Over the course of the year,

W.A.'s grades varied significantly. W.A. received F grades on multiple assessments, but he also, at times, received As, and he ultimately advanced to tenth grade. (A.R., Vol. 1 at 388.)

W.A.'s 2021–22 tenth grade IEP continued the same general approach, supplemented with the "transitional" supports that become available to students as they approach the point at which they will transition out of the age for secondary schooling. (A.R., Vol. 2 at 823–33.) The IEP continued to focus on fluency and expression, rather than basic skills, and included no express reference to dyslexia. (*Id.* at 823–33.)

In the eleventh grade, however, a teacher again developed concerns that W.A.'s reading problems went beyond the deficits reflected in the IEP. The teacher, Bethanie Hargett-Slack, told W.A.'s mother that, in her view, W.A. could not read. The two discussed the possibility of having dyslexia screening performed on W.A. W.A.'s mother identified this conversation as the first time she learned that W.A.'s disabilities might include dyslexia. (A.R., Vol. 1 at 390; A.R., Vol. 2 at 434, 582.)

W.A.'s 2022–23 IEP, however, continued to identify W.A. only as having a "Specific Learning Disability" with deficits in "Reading Fluency" and "Written Expression" and continued the same general approach to providing accommodations and support. (*Id.* at 840, 848–49.)

W.A.'s grades remained mixed. One potential reason for that is that, when W.A. performed take-home assignments, he used a system of interrelated technological supports that enabled him to bypass the conventional writing process. The administrative law judge ("ALJ") who considered this case provided an example of how W.A.'s system worked:

> W.A. can speak the words of a topic such as "George Washington" into a Word document by using speech to text software. He can then paste that written word, "George Washington," into an artificial intelligence bot, such as "Chat GPT." . . . . The artificial intelligence bot can create a paper about the subject matter, here George Washington, that W.A. can highlight and paste back into a Word document. W.A. can then run the Word document through another software program,

7

"Grammarly," which will create a demeanor or style (e.g., business, informal paper, graduate level, undergraduate level, or essay). Where words appear as underlined for being contextually inappropriate, W.A. would click and change them per the software's suggestion, although he would not understand the changes being made by the software, or whether they were actually grammatically appropriate. W.A. will next use read-aloud software to read him the newly fashioned Word document, and he then would change items that he was not satisfied with or that "didn't sound right." At that point, if Word notes grammatical errors, W.A. can again click to make automatic changes that would be inserted by the software. Once the product is finished, W.A. cannot read it himself—he again would listen to the read-aloud software.

(A.R., Vol. 1 at 392.) Although that full range of tools may not have been available to him while at school, his in-school accommodations did include technical supports that similarly permitted some circumvention of the need to actually read in a conventional manner, particularly through technology capable of "reading" photographed written language aloud to the user. (*See, e.g.*, A.R., Vol. 2 at 829.)

The IDEA and its implementing regulations grant a child's parent "the right to an independent educational evaluation," or "IEE," "at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1); *see* 20 U.S.C. § 1415(b). On November 13, 2022, W.A.'s mother made such a request. (A.R., Vol. 1 at 394; A.R., Vol. 2 at 857.) Two assessments were performed in connection with the request. One of the assessments, by school psychologist Dr. Ryann King, focused on whether W.A. exhibited autism and/or attention deficit/hyperactivity disorder ("ADHD"). Dr. King concluded that a finding of impairments based on those conditions was supported, but she did not focus meaningfully on the possibility that W.A. might be dyslexic. (*Id.* at 857–64.)

The other assessment was performed by school psychologist Rebecca G. Townsend, who concluded that W.A. exhibited dyslexia, dysgraphia, ADHD, and autism. (*Id.* at 865–80.) Townsend found, among other things, that W.A. was below the 0.1 percentile rank for an array of

8

skills related to reading and writing—including, specifically, his "Basic Reading Skills," such as "Letter-Word Identification," which were at around a second grade level. (*Id.* at 873.) Townsend wrote:

> [W.A.] demonstrates weaknesses in phonological processing that appear to interfere with his reading and writing skills. In addition to using an evidence-based intervention to build [W.A.'s] phonological processing skills, it may also help to practice playing word games that require rhyming, blending sounds together to form a word, removing a sound from a word to form another word, and saying a word one syllable or one sound at a time. In some cases, incorporating letters (orthography) is helpful for supporting and building phonological processing. For example, use letter cards to build a word and then change one or more letters or letter combinations to form a different word.

(*Id.* at 879.) Townsend, however, did not dispute that W.A. also needed support with regard to more advanced skills, like fluency. Rather, she explained that his fluency instruction should be combined with instruction involving more basic skills:

> Reading teachers are encouraged to focus on developing [W.A.'s] reading fluency and de-emphasize individual word analysis. Teachers can combine fluency techniques such as imitative reading, repeated reading, radio reading, phrase reading, paired reading, and echo reading with basic sight-word recognition, decoding, vocabulary development, and comprehension lessons.

(*Id.*)

In 2023, W.A. began receiving private tutoring from Dr. Sarah McAfee, a dyslexia specialist. Dr. McAfee used the Wilson Reading and Language System with W.A. Dr. McAfee attended a February 2023 meeting of W.A.'s IEP team, where she recommended that such one-on-one tutoring be included in the IEP for the coming year. (A.R., Vol. 1 at 401.)

CMCSS's proposed 2023–24 twelfth grade IEP acknowledged his autism diagnosis and his parents' concerns regarding whether W.A. was receiving sufficient supports. (A.R., Vol. 2 at 888–89.) The IEP's assessment of W.A.'s impairments, however, continued to focus on fluency and expression, rather than on basic skills. (*Id.* at 891–92.) The IEP acknowledged that W.A. would

need language-related interventions to be provided in a special education setting, but it did not call for services to be provided by an outside tutor like Dr. McAfee. (*Id.* at 898–99.) W.A.'s parents felt that the proposed IEP was insufficient, and, while they signed it, they noted, in writing, that they were agreeing only to the provision of the listed services "versus none at all" and did not agree that the IEP "provides FAPE." (*Id.* at 900.) W.A. indicated agreement with that position. (*Id.*)

## C. Administrative Proceedings and Evidence of Alleged Flaws in CMCSS's Approach

"The IDEA . . . provides for administrative procedures to resolve disputes when the people involved in the creation of an IEP are not able to agree on its substance." *Long*, 197 F. App'x at 432 (citing 20 U.S.C. § 1415(b)); *see* 20 U.S.C. § 1415(b)(6), (f)–(g), (k). Those procedures permit any affected party to raise before an ALJ any dispute "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).). "Any party aggrieved by the findings and decision made under" the administrative complaint process "shall have the right to bring a civil action with respect to the complaint presented" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A); *see also S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642–43 (6th Cir. 2008). On March 23, 2023, W.A. and his parents filed a Complaint before an ALJ pursuant to those procedures. (A.R., Vol. 1 at 1–15.) The Complaint asserted causes of action pursuant to the IDEA, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and 42 U.S.C. § 1983. (*Id.* at 12–13.)

The plaintiffs alleged that W.A. had been denied a FAPE by CMCSS's failure to address his dyslexia, autism, and ADHD. (*Id.* at 8.) In addition to their more general concerns regarding the adequacy of the services provided to W.A., W.A. and his parents faulted CMCSS for failing to

comply with the Say Dyslexia Act by failing to provide adequate screening for dyslexia, failing to provide W.A. and his parents with the notice and information required by the Act, and failing to perform any "dyslexia-specific interventions." (*Id.* at 11.) The parties engaged in discovery, and the plaintiffs' challenge was ultimately heard by ALJ Phillip Hilliard in a three-day due process hearing. (*See* A.R. Vol. 1 at 1, Vol. 2 at 1–682.)

During the hearing, the ALJ heard testimony that W.A. was, at that time, on pace to graduate successfully with a 3.4 GPA. (A.R., Vol. 2 at 200–01.) W.A. and his parents conceded that that was the case, but argued that W.A.'s grades did not reflect his progress, because, as his mother testified, those grades had been enabled, at least in part, by his reliance on assistive technology, including ChatGPT, voice-to-text, and the Grammarly software. (*Id.* at 458–60.) She explained that W.A. was capable of absorbing educational information from ordinary, spoken instruction, but that, if reading or writing was involved, that information recall only translated to good grades based on W.A.'s "accommodations and workarounds." (*Id.* at 464.) She confirmed that, if called on to write for himself, W.A. was not even consistently capable of spelling his surname correctly.[3] (*Id.* at 466.)

Counsel for W.A. likened W.A.'s situation to that of a swimmer in a race who advanced from one side of the pool to the other by dragging himself along the ropes. Such a swimmer, counsel explained, could "get from point A to point B," but would not be "actually swimming." (*Id.* at 16.) In addition to the evidence presented regarding W.A.'s use of technological assistance for take-home assignments, the evidence at the hearing demonstrated the ways in which W.A.'s in-school accommodations also enabled him to obtain passing grades, despite his reading and

---

[3] This fact is confirmed by W.A.'s signatures, including the signature on his proposed 12th-grade IEP. *(See* A.R., Vol. 2 at 900.)

writing difficulties. For example, W.A. was permitted to use "Snap&Read" technology on assignments, which converts a photograph of text into artificial speech. (*Id.* at 92. 147, 895.)

Some of the evidence presented to the ALJ casts doubt on the possibility that it is necessarily significant, in and of itself, whether or not the documentation surrounding a child's special education specifically uses the term "dyslexia." CMCSS Director of Special Populations Taylia Griffith explained that CMCSS favored the use of more generic language because dyslexia was not a recognized "eligibility category" under the IDEA. (*Id.* at 136–37.) That characterization is an accurate statement of the law, in that "'[d]yslexia' is not a qualifying disability category," but, rather, "one example of various disabilities falling within the eligibility category of Specific Learning Disability." *L.C. on behalf of A.S. v. Issaquah Sch. Dist.*, No. C17-1365JLR, 2019 WL 2023567, at *17 (W.D. Wash. May 8, 2019) (citing 34 C.F.R. § 300.8(c)(10)(i)). However, the terminology that Griffith suggested would be appropriate instead of an express reference to dyslexia—an acknowledgment of deficits in "basic reading skills"—was precisely the term that began to be omitted from W.A.'s IEPs in favor of a focus on fluency and expression. (A.R., Vol. 2 at 136.)

Griffith's testimony, moreover, did not suggest that IDEA's failure to acknowledge dyslexia as a distinct eligibility category negated the possibility that a specific diagnosis of dyslexia might have a meaningful bearing on the appropriateness of interventions in the case of any particular student. Griffith, moreover, conceded that, while it is appropriate to use technology to assist disabled students, it can be a problem if the technology "mask[s]" whether the student is "able to do the work" or becomes a "substitute" for actually learning a necessary skill that the student is capable of learning. (*Id.* at 232–37.)

12

W.A. and his parents called, as an expert, Katheryn Elizabeth Metcalf, who had, until recently, served as the Director of Special Education for the Crockett County School System. (*Id.* at 242–44.) Metcalf testified that she had been specifically trained by the State of Tennessee regarding the dangers of allowing students with reading difficulties to become overly dependent on technological supports. (*Id.* at 245–47.)

She also testified that a focus on more advanced topics of fluency and written expression, before a child has developed basic reading skills, is ineffective. (*Id.* at 253–54.) She testified, however, that, based on her review, "all of W.A.'s evaluations and IEPs have focused on reading fluency but never addressed basic foundational reading skills."[4] (*Id.* at 320.) "Basic reading skills," Metcalf explained, are the foundational skills, such as those involving phonetics and the alphabet, that are typically learned in kindergarten through third grade, whereas "fluency" focuses on more complex issues such as tone and conventions. (*Id.* at 369–73.) Both areas, Metcalf explained, are important, but fluency should be learned as a "next step," rather than as an alternative to basic reading skills. (*Id.* at 371.)

As a result of CMCSS's failure to focus on W.A.'s deficits in basic reading skills, Metcalf opined, CMCSS was merely asking W.A. to "do the same thing over and over" without ever "getting at the root cause" of his difficulties. (*Id.* at 328.) She testified that, in her professional opinion, W.A.'s IEP goals "were not written to assist him in developing" the necessary basic skills. (*Id.* at 339.) She opined that the IEPs were, therefore, not "instructionally appropriate" with regard to reading. (*Id.* at 353.) W.A., in her view, needed intervention "using dyslexia-specific materials" that would help him build "foundational reading skills." (*Id.* at 354.) She explained that, in her view, "accommodations are wonderful, but they don't replace intervention and instruction to the

---

[4] As the court has noted, this statement is true with regard to most of the IEPs at issue in this case, but W.A.'s first IEP did, in fact, acknowledge a deficit in Basic Reading Skills. (A.R., Vol. 2 at 684.)

point where we don't keep trying." (*Id.* at 367.) Accordingly, IEPs should be written with "specific skill deficits in mind," even if some of the effects of those deficits can be mitigated by accommodations. (*Id.*)

Metcalf testified that she examined W.A. herself, including by having him perform a writing exercise without technological assistance, and she concluded that his deficits did, in fact, reflect a "[l]ack of foundational reading and writing skills," rather than simply a lack of fluency. (*Id.* at 337.) Indeed, she concluded that he "ha[d] not mastered the basic mechanical skills necessary to produce a written product of more than one sentence that conveys a complete thought or idea." (*Id.* at 338.)

W.A. and his parents also presented testimony by Dr. McAfee, both as a fact witness, regarding her work with W.A., and as an expert witness based on her experience and training as a "dyslexia specialist reading interventionist." (*Id.* at 388–90.) Dr. McAfee opined that W.A. was "not able to read much of anything that [she] put in front of him" and needed "systematic decoding instruction," meaning instruction that would "go back to the very basic introduction of the alphabet, the alphabetic principle, [and] alphabet sequencing," in order to teach W.A. to "learn letters and sounds in order to put them together to make words." (*Id.* at 397–98.) She testified that she had worked with W.A. about 35 times, over the course of three months, and that she had been able to advance him to Step 2 of the 12-step Wilson Reading and Language System. (*Id.* at 400–01.) She opined that, based on her experience with students who had exhibited similar deficits, W.A. would likely be able to finish all of the steps within three or four years. (*Id.* at 401.)

Dr. McAfee testified that, in her experience, it is not uncommon to meet individuals who were able to obtain formal diplomas without ever learning to read. She explained that, for some schools, "one answer to kids like [W.A.] is to just heavily accommodate [and] accommodate,

add[ing] more accommodations" that would permit the student to obtain adequate grades and graduate without having addressed the student's language deficits. (*Id.* at 414.)

CMCSS's hearing evidence related to reading focused, in significant part, on W.A.'s strong grades. (*E.g.*, id. at 516–17, 613.) An assistant principal at W.A.'s school, Dr. Mandy Frost, acknowledged that sometimes students receive improperly inflated grades to enable their advancement or graduation, but she said that W.A.'s grades did not appear, to her, to reflect such a pattern. (*Id.* at 527–28.)

Hargett-Slack—the teacher who discussed the possibility of dyslexia with W.A.'s mother in eleventh grade—testified to the importance of classroom-based work to the grades she awarded, potentially supporting the inference that W.A.'s full system of technological supports available at home might be unlikely to account for all of his strong grades. (*Id.* at 588–89.) Hargett-Slack, however, did not dispute that W.A., as his IEPs suggested, had access to some technological supports, particularly Snap&Read, in connection with classroom-based work. (*Id.* at 591–92.)

Hargett-Slack further acknowledged that W.A. could have surreptitiously used ChatGTP in the classroom as well, given his continuous access to a computer. (*Id.* at 575–76, 592–93.) Hargett-Slack also conceded that, based on W.A.'s accommodations granting him extra time on assignments, she permitted him to take some normally classroom-based work home to complete, and she acknowledged that, despite W.A.'s ultimate passing grade, he received numerous Ds and Fs on assignments. (*Id.* at 593, 604.) Hargett-Slack admitted that she once asked W.A. to read one of his own completed assignments, but he could not do so and ultimately conceded that he had not written it himself. (*Id.* at 606.) She did not deny discussing the severity of W.A.'s situation with his mother, although her recollection of the details differed slightly. (*Id.* at 581–82.) Another

15

teacher, Chelsie Jensen, confirmed that W.A. received accommodations in connection with in-school work. (*Id.* at 621.)

Another of W.A.'s teachers, Lisa Elliott, testified that W.A. earned strong grades in the Algebra II course that she taught and that, during that course, she observed W.A. successfully performing in-classroom work. (*Id.* at 613–614.) CMCSS also presented testimony by Dr. King as an expert in school psychology. (*Id.* at 492, 588–89.) Dr. King took issue with certain methodological aspects of Metcalf's report, but she did not opine more broadly regarding W.A.'s dyslexia-related needs. (*Id.* at 505–06.)

On July 28, 2023, the ALJ issued a Final Order, holding that the plaintiffs had "met their burden of proof to show that CMCSS did not provide W.A. with FAPE because CMCSS violated its obligation to provide W.A. with an appropriate individualized education program (IEP) reasonably calculated to enable W.A. to make progress appropriate in light of his circumstances, which deprived W.A. of an educational benefit in the areas of reading and writing, from the time of the 2017-2018 IEP through the filing of the due process complaint." (A.R., Vol. 1 at 433–34.) The ALJ included a discussion of the Say Dyslexia Act, particularly with regard to CMCSS's failure to provide "dyslexia-specific interventions," as discussed in Tenn. Code Ann. § 49-1-229(f)(1). (*Id.* at 405.) The ALJ, however, also discussed CMCSS's alleged failure to address W.A.'s dyslexia more generally. He specifically credited Metcalf's testimony in light of her relevant education, experience, and expertise, and he concluded that the substance of her testimony was "almost entirely unrebutted." (*Id.* at 407.) The ALJ noted, in particular, the high school IEPs' consistent failure to identify basic reading skills as a deficit area. (*Id.* at 411.)

The ALJ acknowledged W.A.'s strong grades and expected graduation, but he also noted, correctly, that the Supreme Court has expressly "declined to hold that . . . every [disabled] child

who is advancing from grade to grade . . . is automatically receiving a [FAPE]." *Endrew F.*, 580 U.S. at 402 n.2 (quoting *Rowley*, 458 U.S. at 203 n.25). He noted that, in contrast with W.A.'s grades, the actual skill assessments depicted in the IEPs showed "relative stagnation" in W.A.'s reading and writing skills, as evidenced by comparing his percentile ranking in assessments, year over year. (A.R., Vol. 1 at 413–15.) The ALJ acknowledged that a lack of progress is not, in and of itself, evidence of a denial of FAPE. He concluded, however, that Metcalf's testimony established that W.A.'s deficits could be addressed, at least to some degree, by basic reading skills-focused interventions that were never provided. (*Id.* at 417.)

The ALJ awarded W.A. "888 hours of compensatory education in the form of 5 sessions per week, at 1 hour per session, of Dyslexia tutoring from a reading interventionist trained to provide Dyslexia tutoring through the Wilson Reading and Language System." (*Id.* at 434.) The ALJ also concluded that W.A.'s claims under the ADA and Section 504 were supported, although he did not award any additional remedies in connection with those claims. The ALJ rejected the § 1983 claim. (*Id.* at 433.)

On August 11, 2023, CMCSS filed a Petition for Reconsideration focused on the nature of the award of compensatory education. CMCSS argued that the "extent and method" of dyslexia-focused compensatory education that W.A. receives should be determined by the IEP team. (*Id.* at 436, 439.) CMCSS expressed a desire, in particular, not to have to rely on the Wilson Reading and Language system. (*Id.* at 438.) On August 22, 2023, the ALJ denied the petition, holding that, while the IEP team did retain jurisdiction over prospective services provided for the 2023–24 school year, the award of compensatory education was granted by the ALJ in connection with a contested case, leaving it within the power of the ALJ to define the scope of the relief required. (*Id.* at 453.)

**D. This Case**

On August 25, 2023, W.A. and his parents filed a Complaint in this court that they characterized as seeking a "revision to the hearing officer's award" with regard to "*who* shall provide the 888 hours of compensatory education." (Doc. No. 1 ¶ 8 (emphasis in original).) Specifically, the plaintiffs ask the court to require that the compensatory education be provided through the Dyslexia Center of Clarksville, where W.A. has already received some services from McAfee, rather than permitting CMCSS to provide the required compensatory education in the manner it chooses, including by, if possible, relying on a qualified provider employed by CMCSS. (*Id.*)

On October 13, 2023, CMCSS filed an Answer to Complaint, Affirmative Defenses, and Counterclaim/Petition for Review. (Doc. No. 6.) CMCSS argues that the ALJ erred by considering issues related to the Say Dyslexia Act, the ADA, and Section 504 of the Rehabilitation Act, which, CMCSS argues, are outside the ALJ's jurisdiction. (*Id.* at 2–6.) CMCSS also argues that W.A. received a FAPE, as shown by his strong grades. (*Id.*)

On February 9, 2024, W.A. and his parents filed a Motion to Enforce Final Order of the Administrative Law Judge, in which they argued that CMCSS was out of compliance with the ALJ's Final Order, which has never been stayed as part of this litigation. (Doc. No. 19.) In particular, W.A. and his parents asserted that CMCSS had failed to provide W.A. with instruction pursuant to the Wilson Reading and Language System, as required by the Final Order (*Id.* at 10–11.) On February 16, 2024, the parties both filed Motions for Judgment on the Administrative Record. (Doc. Nos. 21–22.)

## II. LEGAL STANDARD

"In reviewing an ALJ's decision in an IDEA case, district courts apply a 'modified de novo' standard that requires the court 'to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.'" *Somberg ex rel. Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018) (quoting *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004)). The Supreme Court has cautioned, however, that the IDEA's judicial review provision "should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Endrew F.*, 580 U.S. at 404 (quoting *Rowley*, 458 U.S. at 206). Accordingly, "[m]ore weight is due to an agency's determinations on matters for which educational expertise is relevant." *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (citing *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000)).

## IV. ANALYSIS

As a preliminary matter, the court incorporates the aforementioned discussion, as well as any forthcoming discussion of factual issues, as its findings of fact for the purposes of review based on the administrative record. The court also acknowledges that the factual issues posed by this case involve issues of educational expertise and that the ALJ's determinations are entitled to due weight. The court's factual conclusions, however, are based on its own review of the record, and its legal conclusions are de novo.

### A. Incorporation of the Say Dyslexia Act into IDEA Requirements

CMCSS argues that the ALJ exceeded his jurisdiction when he considered CMCSS's compliance with the Say Dyslexia Act as part of this case. That characterization, however, does

19

not reflect the actual role of the Say Dyslexia Act in the underlying claims. W.A. and his parents have not asserted, and the ALJ did not consider, any standalone claim based on the Say Dyslexia Act. Rather, the ALJ considered the requirements of that Act in connection with its determination of whether the plaintiffs established a claim under the IDEA. The ALJ unambiguously possessed jurisdiction to consider the plaintiffs' IDEA claim pursuant to Tenn. Code Ann. § 49-10-606(a). The relevant inquiry, then, is not jurisdictional, but substantive—involving not whether the ALJ had jurisdiction to consider a Say Dyslexia Act "claim" (of which there was none), but, rather, whether the relevant standards of the Say Dyslexia Act were an appropriate consideration in connection with W.A.'s IDEA claim.

The IDEA's definition of "FAPE" incorporates "the standards of the State educational agency," 20 U.S.C. § 1401(9)(B), but it does not name any specific standard, from any state, by name. The IDEA's incorporation of state standards through general language, however, is not unique. For example, the Assimilative Crimes Act "assimilates into federal law, and thereby makes applicable on federal enclaves . . . , certain criminal laws of the State in which the enclave is located," not by setting forth a laundry list of individual states' statutes, but by referring generally to "act[s] or omission[s] which . . . would be punishable if committed or omitted within the jurisdiction of the State . . . in which [the enclave] is situated." *Lewis v. United States*, 523 U.S. 155, 158 (1998) (quoting 18 U.S.C. § 13(a)). The Supreme Court has considered that approach and found it to be generally permissible. *See United States v. Sharpnack*, 355 U.S. 286, 293–94 (1958). There is, therefore, no inherent obstacle to the IDEA's incorporating a standard like the Say Dyslexia Act.

For a state standard to be incorporated in a federal law, however, it must actually meet the description set out in the relevant federal statute. CMCSS argues that the Say Dyslexia Act should

not be treated as incorporated into the IDEA because the Say Dyslexia Act "is not a special education statute." (Doc. No. 21-1 at 8.) While that characterization is debatable—given that, among other things, the Act's screening procedures unavoidably overlap with aspects of the "child find" process—it certainly is true that the Say Dyslexia Act is not *solely* or *expressly* a special education statute, but, rather, a general education statute focused on identifying students in need of dyslexia-specific intervention, whether or not that intervention would meet any particular definition of "special education."

The IDEA, however, makes no distinction that would hinge on that characterization. It simply states that an IDEA-covered student is not provided with a FAPE unless his education complies with the standards of the SEA. The Say Dyslexia Act is part of the administrative structure imposed by the TDOE and is, therefore, unambiguously a standard of the SEA. Accordingly, a FAPE must, by the plain language of the IDEA, comply with the Say Dyslexia Act, insofar as the Act imposes any obligations related to the provision of educational services to a child covered by the IDEA. That does not mean that the IDEA effectively federalizes the Say Dyslexia Act, because the IDEA does not guarantee a FAPE to everyone—only children with qualifying disabilities significant enough to require special education and related services. *See* U.S.C. § 1401(3)(A). W.A., however, *is* entitled to a FAPE under the IDEA, and once that entitlement arises, it can only be met by providing an education that complies with applicable state standards, which include the Say Dyslexia Act. Considering the Act, therefore, was not error.

It bears noting, however, that one should not overstate the role of the Say Dyslexia Act in this case, or under the IDEA in Tennessee more generally. Whether or not the IDEA technically requires compliance with the Say Dyslexia Act is a distinct question from whether any given Say Dyslexia Act violation—even one involving an IDEA-eligible child—would support an award of

relief under the IDEA. The Say Dyslexia Act's requirements are mostly procedural, and a procedural IDEA violation only entitles a party to relief under the IDEA if it "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). The Supreme Court, moreover, has made clear that the "only relief the IDEA makes available" is "relief for the denial of a FAPE," meaning that the statute leaves no room for liquidated damages, consequential damages, or penalties based on purely technical violations. *Fry*, 580 U.S. at 165. Accordingly, while the Say Dyslexia Act or another state statute may raise the bar in terms of what a school system is formally required to do in some situations, a student or parent can only prevail on an IDEA claim if the challenged errors resulted in an actual deprivation of, or impediment to, the educational benefits and/or right of parental participation guaranteed by the IDEA.

## B. The ALJ's Authority to Consider Non-IDEA Federal Claims

The ADA and Section 504, in contrast with the Say Dyslexia Act, were cited by W.A. and his parents as the sources of distinct causes of action—meaning that CMCSS's framing of these issues as involving jurisdiction is, in this instance, correct. As CMCSS acknowledges, however, this court considered the question of a Tennessee ALJ's jurisdiction to consider IDEA-adjacent ADA and Section 504 claims at length in *P.G. through A.G. v. Genesis Learning Centers*, No. 3:19-CV-00288, 2019 WL 3231363 (M.D. Tenn. July 18, 2019), concluding that Tenn. Code Ann. § 49-10-606 grants the ALJ in an IDEA case jurisdiction to consider "both IDEA claims and other claims that are required, by the IDEA, to be treated procedurally as the equivalent of IDEA claims." *Id.* at *7.

22

That reference to claims "required . . . to be treated procedurally as the equivalent of IDEA claims" refers to 20 U.S.C. § 1415(l), which provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

20 U.S.C. § 1415(l) (emphasis added). As the court observed in *Genesis Learning Centers*, a holding that Tennessee administrative statutes did not permit exhaustion of such claims at the ALJ level would arguably bring Tennessee out of compliance with the IDEA. *See Genesis Learning Centers*, WL 3231363, at *7. The court, accordingly, construed the authority of a Tennessee ALJ to consider "[s]pecial education due process cases" to include the authority to consider both IDEA claims and other federal claims made subject to the IDEA exhaustion requirement by the IDEA itself. *Id.*

CMCSS urges the court to reconsider its holding in *Genesis Learning Centers* based on the Supreme Court's intervening clarification of 20 U.S.C. § 1415(l) in *Luna Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023). The Supreme Court's holding in *Luna Perez*, however, does not erase the fact that some ADA and Section 504 claims are subject to IDEA exhaustion. Rather, the Supreme Court merely held that, just as the language of § 1415(l) suggests, such exhaustion is not required if "the remedy [the] plaintiff seeks is not one [that] IDEA provides," such as traditional money damages. *Id.* at 150. The relief that these plaintiffs requested from the ALJ, however, included no such request for remedies outside the scope of what could be awarded under the IDEA's relatively flexible remedial framework. (*See* A.R., Vol. 1 at 14.) *Luna Perez*, therefore, has no bearing on this case and does not exempt W.A.'s non-IDEA claims from the established 20

U.S.C. § 1415(l) framework. The court, accordingly, has no basis for concluding that the ALJ exceeded his jurisdiction in this instance.

The court's holding, however, is limited to the topic of the ALJ's jurisdiction, which is the only ADA or Section 504-related issue raised in this case. CMCSS has expressed a concern that the ALJ's holdings regarding the ADA and Section 504 might be cited as a basis for granting the plaintiffs non-IDEA damages in a separate case stating claims under those statutes, but the fact that the ALJ had jurisdiction to consider those claims, in the limited context of ensuring adequate 20 U.S.C. § 1415(l) exhaustion, does not necessarily mean that any merits determination by the ALJ would be binding on a federal court. The court, therefore, stresses that it makes no holding regarding the preclusive effect, if any, of the ALJ's rulings regarding non-IDEA claims.

## C. W.A.'s FAPE

Although CMCSS's arguments focus, in significant part, on whether the ALJ inappropriately considered statutes other than the IDEA, CMCSS also argues generally that W.A. received a FAPE, as evidenced, in particular, by his passing grades. CMCSS argues that the ALJ focused unduly on whether W.A. received "dyslexia-specific" interventions, when W.A. had, in fact, received both support and accommodations based on his reading- and writing-related difficulties for the entirety of his time in CMCSS.

The question of what constitutes a FAPE is a notoriously difficult one. *See, e.g.*, *Rowley*, 458 U.S. at 202 (observing that "[t]he determination of when [disabled] children are receiving sufficient educational benefits to satisfy the requirements of the Act presents a . . . difficult problem"). The Supreme Court, however, has set some benchmarks that guide the court's inquiry. One of those benchmarks is that, "if the child is being educated in the regular classrooms of the public education system," then his education "should be reasonably calculated to enable the child

to achieve passing marks and advance from grade to grade." *Id.* at 204. Since that principle was set forth, however, the Supreme Court has made clear that the IDEA is not narrowly fixated on passing grades and grade-level advancement. Rather, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399. That IEP, moreover, must be "appropriately ambitious in light of [the child's] circumstances." *Id.* at 402. Simply finding some combination of accommodations and lenience that allows a child to graduate is not necessarily enough. *See Endrew F.*, 580 U.S. at 402 n.2.

Accordingly, CMCSS is correct that W.A.'s grades are significant evidence in favor of a finding that he received a FAPE, but W.A. and his parents are also correct that the grades alone do not render this an open-and-shut case. The ALJ determined that W.A.'s ability to obtain a passing average in subjects requiring reading and writing was likely not the product of consistently adequate performance, but, rather, at least in significant part, the result of the fact that W.A. developed complex technological workarounds that allowed him to bypass the need for reading and writing skills. Based on the court's review of the record, it is difficult to know, with certainty, exactly how much those workarounds accounted for W.A.'s passing grades, because the record is not sufficient to enable an assignment-by-assignment reconstruction of how those grades were awarded. The court, however, finds that the evidence in the administrative record shows that W.A.'s passing grades and grade-level advancements were, in significant part, enabled by the use of technological assistance that allowed him to bypass, rather than address, his lack of basic reading skills due to his dyslexia.

The substantial, corroborated evidence of W.A.'s severe, persistent reading and writing deficits, moreover, provides strong support for the inference that, while W.A.'s passing grades

reflected W.A.'s work ethic and capacity for information retention, those grades do not establish that he received a FAPE with regard to the specific area of reading and writing skills. Deficits alone, of course, do not show the denial of a FAPE—because a FAPE must be judged "in light of the child's circumstances," *Endrew F.*, 580 U.S. at 399, and some children have persistent deficits that a school cannot be, and is not, expected by the IDEA to overcome. The evidence in the administrative record, however, shows that W.A. is, in fact, likely to be able to improve his reading and writing skills, at least to some degree, through interventions specifically designed for students with dyslexia. Indeed, all of the available evidence suggests that, for nearly the entirety of W.A.'s time at CMCSS, he was being treated like a student whose ill-defined learning disability compromised his fluency and expression—not as a student who lacked basic reading skills due to dyslexia. The court, accordingly, concludes, as the ALJ did, that CMCSS's failure to provide interventions appropriate to W.A.'s disabilities resulted in a denial of FAPE with regard to basic reading skills. Although CMCSS undisputedly acknowledged that W.A. had reading and writing deficits in his IEPs and provided some corresponding support, an individualized plan responsive to W.A.'s specific circumstances would have focused on addressing his lack of foundational reading skills, which his IEPs did not.

The court's finding, in that regard, is based on the likely efficacy of targeted instruction focused on basic reading skills for individuals with dyslexia, as compared to the education that W.A. actually received. The court, in other words, is not formalistically relying on whether W.A.'s IEPs expressly invoked "dyslexia" in describing the services provided. If the ALJ had, in fact, relied solely on whether the support that W.A. received was expressly designated as "dyslexia-specific," that may well have been error. That, though, is not what the ALJ did, and it is not what the court is doing here. The ALJ considered W.A.'s specific needs and concluded that a FAPE

26

required W.A. to receive certain specific tutoring services that would likely have been more effective than the inadequate support he actually received. This court, based on its review of the record, reaches the same conclusion. The IDEA guarantees W.A. educational benefits appropriate to his situation—not merely generic support for children who struggle with language and a system of accommodations so sweeping that it makes the severity of his disability hard to notice.

Similarly, this court does not base its conclusion on technical noncompliance with the Say Dyslexia Act. If CMCSS violated all of the Say Dyslexia Act's general requirements, but had nevertheless adequately addressed W.A.'s specific disability-related needs, there would be no basis for an award under the IDEA. Conversely, if CMCSS had made an effort to scrupulously comply with the Say Dyslexia Act, but had nevertheless failed to provide necessary services, that technical compliance would not excuse the underlying IDEA violation. It may well be true that, if CMCSS had granted W.A. access to the structure envisioned by the Say Dyslexia Act, that would have prevented a violation of his right to a FAPE. It is, however, that denial of an educational benefit—not the details of how it might have been avoided—that supports an award to the plaintiffs.

W.A. has established, with evidence, that he likely would have benefited substantially from one-on-one tutoring geared toward addressing his specific, dyslexia-correlated deficits, rather than the more general support that he received, and that the adequacy of his educational benefit was significantly degraded by CMCSS's failure to provide that manner of services. An individualized approach tailored to W.A.'s specific needs would not simply have provided him general language supports, but would have recognized his specific need to focus on basic reading skills, guided by an awareness of his dyslexia. The court, accordingly, will uphold the ALJ's determination that

27

W.A. was denied a FAPE.[5] The court, moreover, agrees with the ALJ's assessment that the appropriate remedy for that denial is the provision of 888 hours of dyslexia-specific tutoring.

**D. Method for Providing Compensatory Education**

The only remaining question, then, is the one that was first raised before this court: whether W.A. has a right to have the court further restrict the mechanisms through which his compensatory instruction should be provided. As a preliminary matter, the court notes that the ALJ was correct that he had the authority to require the use of the Wilson Reading and Language System, regardless of the fact that, if CMCSS had provided dyslexia-specific interventions in the first place, it would have had the discretion to choose between other alternatives. The IDEA takes a "flexible approach" to remedies, *L.M.*, 478 F.3d at 316, allowing a court to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate." *L.M.*, 478 F.3d at 316 (citing 20 U.S.C. § 1415(i)(2)(C)(iii); *Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006)); *see, e.g.*, *Somberg*, 908 F.3d at 177; *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 978 (6th Cir. 2012). The ALJ concluded that, because W.A. had already received numerous sessions in connection with the Wilson Reading and Language System and had advanced within that system, continuing along that course would provide the appropriate remedy. The court agrees. Whether or not other systems might work adequately in the abstract, W.A.'s individual situation is that (1) these interventions are occurring far later in his education than they should have and (2) he has already done substantial work in the Wilson Reading and Language System. The court holds

---

[5] In addition to the ALJ's focus on W.A.'s general denial of a FAPE, the ALJ found that CMCSS had failed to provide W.A. with sufficient transition services, for which the ALJ ordered only very modest relief in the form of providing W.A. with some career-related assessments. (A.R., Vol. 1 at 431.) CMCSS briefly addresses this aspect of the ALJ's holding in its briefing, but its argument is conclusory and amounts to little more than saying that the ALJ erred. The court finds no error with regard to this aspect of the ALJ's determination.

that the appropriate mechanism for remedying his denial of a FAPE is continuation of that approach.

W.A.'s primary argument in favor of modifying the relief to require CMCSS to rely on the Clarksville Center for Dyslexia is that CMCSS's failure to provide W.A. with instruction under the Wilson Reading and Language System until now should be construed as either a refusal or an inability to do so. The court, however, finds no basis for drawing so strong an inference. For the overwhelming majority of the time that CMCSS failed to provide W.A. with the manner of instruction he needed, it did so because it appears to have been genuinely unaware of the specific nature of his needs. CMCSS has represented to this court that it is "ready, willing, and able to provide the compensatory education ordered by the Administrative Judge," as long as it is able to resolve "logistical problems" surrounding (1) W.A.'s schedule and (2) access to data regarding his progress with McAfee. (Doc. No. 23 at 1.) This court's only remedial power, under the IDEA, is to order a remedy adequate to address the denial of W.A.'s FAPE. The court cannot conclude, at this stage, that instruction provided through W.A.'s preferred source, the Clarksville Center for Dyslexia, is the only potentially adequate source of such instruction.

W.A. and his parents ask the court to consider two additional pieces of evidence that, they argue, establish CMCSS's inability to provide instruction in the Wilson Reading and Language System: an audio recording of a November 2023 IEP meeting showing that CMCSS generally uses another system and evidence from another student's case suggesting that the "literacy transition" teachers at W.A.'s school lacked dyslexia-specific training in 2020 and that there is some question regarding the extent of such training now. Neither of those pieces of evidence, however, suggests that CMCSS is categorically incapable of providing the necessary instruction through any mechanism other than through the Clarksville Center for Dyslexia.

If CMCSS does prove to be wholly incapable of providing Wilson Reading and Language System instruction with its own personnel in a timely manner, then it will, by necessity, have to look to an outside vendor. The court, however, has no basis for requiring it to do so and certainly has no basis for selecting one particular vendor. The court, accordingly, will require the same compensatory education that the ALJ did and will stress that it must be provided expeditiously— including, if necessary, through an outside party.[6] If CMCSS fails to meet that obligation, W.A. can return to this court to seek enforcement of its Order. For now, though, CMCSS's obligation is to provide the necessary compensatory education through whatever adequate staffing and funding mechanism it chooses. Because the relief originally ordered by the ALJ will now become relief ordered by this court, the plaintiffs' motion to enforce the ALJ's Order will become moot.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion to Enforce Final Order of the Administrative Law Judge (Doc. No. 19) will be denied as moot, the plaintiffs' Motion for Judgment on the Administrative Record (Doc. No. 25) will be granted as to all issues other than their requested modification of the remedy, and will, in that respect, be denied, and CMCSS's Motion for Judgment on the Administrative Record (Doc. No. 22) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[6] The court will, however, omit the requirement that the instruction be provided by a "reading interventionist," because CMCSS has disputed whether "Sarah McAfee or anyone associated with the Clarksville Center for Dyslexia is a reading interventionist within the meaning of Tennessee law." (Doc. No. 26 at 2.) Whatever the import of that distinction is with regard to general, prospective compliance with the Say Dyslexia Act, there has been no showing that a formal designation as a reading interventionist is necessary for the provision of adequate compensatory education in W.A.'s case. The court will also permit some greater flexibility with regard to scheduling.