IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILLIAM A., *a minor student, by and through his parents, E.A. and C.A.*,[1]

    Plaintiff,

v.

CLARKSVILLE/MONTGOMERY COUNTY SCHOOL SYSTEM,

    Defendant.

Case No. 3:23-cv-00912
Judge Aleta A. Trauger

## MEMORANDUM

**I.    FACTS AND PROCEDURAL HISTORY**

    **A.    Background**

The court will briefly recount the facts and procedural history. A comprehensive recitation appears in this court's Memorandum (Doc. No. 27) and in the Sixth Circuit opinion affirming this court's judgment. *See William A. by & through E.A. v. Clarksville-Montgomery Cnty. Sch. Sys.*, 127 F.4th 656 (6th Cir. 2025).

---

[1] According to documents in the Administrative Record, William was not a minor even when the Complaint was filed. (*Compare* Doc. No. 1 (Complaint filed August 25, 2023), *with e.g.*, Doc. No. 18-1 at 6, A.R. Vol. 1 at 1 (listing William A.'s birth date as before August 2005), *and id.* at 90, A.R. Vol. 1 at 85 (same), *and* Doc. No. 18-4 at 684, A.R. Vol. 2 at 683 (same).) Since the Complaint was filed, William A. has graduated from high school. *See William A. by & through E.A. v. Clarksville-Montgomery Cnty. Sch. Sys.*, 127 F.4th 656, 657 (6th Cir. 2025).

William A., the plaintiff, was a student in the Clarksville-Montgomery County School System ("CMCSS"), the defendant. His parents are E.A. and C.A. William[2] has dyslexia and graduated from high school "without being able to read or even to spell his own name." *Id.* at 660. Despite William's delayed eleventh-grade dyslexia diagnosis, and despite his progress with Dr. Sarah McAfee of the Dyslexia Center of Clarksville, his individualized education program was not sufficiently updated to address his dyslexia. *Id.* at 658–60. (*See also* Doc. No. 27 at 16.) So, William's parents filed an administrative complaint under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (Doc. No. 27 at 10.) "The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017) (quoting 20 U.S.C. § 1412(a)(1)(a)).

An Administrative Law Judge ("ALJ") ordered "888 hours of compensatory education in the form of 5 sessions per week, at 1 hour per session, of Dyslexia tutoring from a reading interventionist trained to provide Dyslexia tutoring through the Wilson Reading and Language System." (Doc. No. 27 at 17 (quoting Doc. No. 18-3 at 134, A.R. Vol. 1 at 434).) The Wilson System, which Dr. McAfee used while tutoring William, is a "twelve-step program designed to help dyslexic persons learn to read." *William A.*, 127 F.4th at 658. The ALJ later denied CMCSS's Petition for Reconsideration of the Final Order's requirement that the district employ the Wilson System. (Doc. No. 18-3 at 102 at 153, A.R. Vol. 1 at 453.)

The plaintiff brought an action in this court, seeking an order modifying the ALJ's decision—to require specifically that the Dyslexia Center of Clarksville would provide William's

---

[2] The court follows the plaintiff's lead and uncharacteristically refers to the student-plaintiff by his first name only. The defendant refers to him as "W.A."

tutoring. (Doc. No. 1 ¶ 9.) CMCSS filed an Answer, Affirmative Defenses, and Counterclaim/Petition for Review seeking reversal of the ALJ's order. (Doc. No. 6.) The plaintiff then filed a Motion to Enforce Final Order of the Administrative Law Judge, in which he argued that the defendant had failed to provide him tutoring using the Wilson System, noting that the ALJ's Order had not been stayed. (Doc. No. 19 at 3–4.) All parties moved for judgment on the administrative record. (Doc. No. 27 at 18.) This court agreed with the ALJ and granted William's Motion for Judgment on the Administrative Record (Doc. No. 25) as to all issues other than his request to modify the ALJ's remedy. (Doc. No. 27 at 30.) This court agreed with the ALJ's determination of the amount and form of compensatory education (Doc. No. 27 at 28–30.) Specifically, the court agreed with the ALJ's conclusion that, "because W.A. had already received numerous sessions in connection with the Wilson Reading and Language system and had advanced within that system, continuing along that course would provide the appropriate remedy." (*Id.* at 28.) But "[t]he court [could not] conclude, at this stage, that instruction provided through W.A.'s preferred source, the Clarksville Center for Dyslexia, is the only potentially adequate source of such instruction." (*Id.* at 29.) Accordingly, on May 24, 2024, the court ordered that:

> the defendant shall provide W.A. with 888 hours of compensatory education of dyslexia-specific tutoring from a qualified provider trained to provide such tutoring through the Wilson Reading and Language System. Insofar as it is reasonably possible, efforts should be made to provide the compensatory education in the form of 5 sessions per week, at 1 hour per session, but the specific scheduling shall be coordinated to accommodate the schedules of all involved and may, if necessary, depart from that format.

(Doc. No. 28 at 1.) The Sixth Circuit affirmed. *William A.*, 127 F.4th at 660.

### B. The Pending Motion

Just over a month after the Sixth Circuit affirmed this court's May 24, 2024 Order ("Order"), the plaintiff filed his Motion to Modify Award of Compensatory Education and Supporting Memorandum of Law (Doc. No. 40) and accompanying declarations (Doc. Nos. 40-1,

3

40-2), to which the defendant has filed a Response (Doc. No. 45) and an accompanying deposition (Doc. No. 45-1)[3] and affidavits (Doc. Nos. 45-2, 45-3), and the plaintiff has filed a Reply (Doc. No. 46). The plaintiff contends that, despite this court's Order, CMCSS has not provided the mandated tutoring competently or expeditiously. (Doc. No. 40 at 2–5.) The plaintiff asks this court to "convert the 888 hours of Wilson reading instruction into a compensatory education fund," which William would use to pay for an "appropriately trained instructor," which costs $80.00 per hour. (*Id.* at 7 & n.1.) In the alternative, the plaintiff asks that the defendant pay a private instructor directly. (*Id.* at 2.)

While the plaintiff has styled his motion as a "Motion to Modify," the court construes it as a motion to enforce. The Order required the defendant to "provide W.A. with 888 hours of compensatory education of dyslexia-specific tutoring from a qualified provider trained to provide such tutoring through the Wilson Reading and Language system." (Doc. No. 28.) The Order further provided that, "[i]nsofar as it is reasonably possible, efforts should be made to provide the compensatory education in the form of 5 sessions per week, at 1 hour per session." (*Id.*) In its accompanying Memorandum, the court clarified that, "[i]f CMCSS does prove to be wholly incapable of providing Wilson Reading and Language System instruction with its own personnel in a timely manner, then it will, by necessity, have to look to an outside vendor." (Doc. No. 27 at 30.) In so doing, the court "stress[ed]" that the compensatory education "must be provided

---

[3] In a related case, the plaintiff has brought an action against the defendant seeking compensatory, declaratory, and injunctive relief under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Equal Protection and Substantive Due Process clauses of the Fourteenth Amendment to the U.S. Constitution. *See* Complaint ¶¶ 3, 60–66, *William A. by & through E.A. v. Clarksville-Montgomery Cnty. Schs.*, No. 3:23-cv-1110 (M.D. Tenn. Oct. 20, 2023), Doc. No. 1. The defendant has filed Dr. McAfee's deposition transcript in that case as Doc. No. 45-1. (*See* Doc. No. 45 at 1 n.1.) The court notes that the deposition transcript appears to erroneously include *this case*'s case number on it.

expeditiously—including, if necessary, through an outside party"—and noted further that, "[i]f CMCSS fails to meet that obligation, W.A. can return to this court to seek enforcement of its Order" (Doc. No. 27 at 30), which he now does.

The court therefore reviews the plaintiff's motion, so construed, under its inherent authority to enforce its own orders. *See Shultz v. Wells*, 73 F. App'x 794, 796 (6th Cir. 2003) (citations omitted) ("[I]t is well established that a federal court ordinarily has the power to enforce its own orders and judgments.").

## II. DISCUSSION

The plaintiff makes several arguments in support of his motion: first, the defendant delayed the start of William's tutoring; second, William's tutoring is inadequate; third, William is not receiving tutoring in the amount, or on the schedule, this court ordered; and fourth, the parties have a contentious relationship. The defendant responds that the plaintiff delayed instruction, that its instruction is competent, and that any shortcomings in hours are explained either by scheduling issues caused by the plaintiff or his parents, or else William's tutor's justifiable scheduling difficulties.

### A. Delay

The ALJ ordered compensatory education in a July 28, 2023 Final Order. (Doc. No. 27 at 16.) William began tutoring roughly one year later, which was about two months after entry of this court's Order.[4] The parties dispute the reason for the gap. The plaintiff states that the defendant refused to begin tutoring until its "appeal" of the AJL's decision was resolved. (Doc. No. 40 at 5 (citing Doc. No. 19, Plaintiffs' Motion to Enforce Final Order of the Administrative Law Judge).)

---

[4] According to the plaintiff, tutoring began in "August of 2024." (Doc. No. 40 at 5.). According to the defendant, it began on July 15, 2024. (Doc. No. 45-3 at 3, Lee Aff. ¶ 5.)

5

The plaintiff argues that delay continued after this court's Order, in violation of the requirement that compensatory education be offered "expeditiously" and that the delay harmed William's reading progress. (*Id.*) The defendant responds that William's parents caused the delay by insisting that his tutor be "certified" in the Wilson System, which, the defendant states, was not required by the ALJ's Order. (Doc. No. 45 at 3.) According to the defendant, "[h]ad E.A. not been adamant that the provider be certified, the tutoring would have started much earlier than July of 2024." (*Id.*) Furthermore, the defendant states, it never told the plaintiff that it would not begin tutoring until its appeal had resolved. (*Id.* at 3.) Instead, the defendant "began providing compensatory education as soon as it received cooperation from E.A." (*Id.* at 3–4.) The plaintiff does not respond to the defendant's argument on this point.

In any event, the plaintiff does not show how his version of events, if true, supports his motion. It is possible that the plaintiff means to argue that the delay itself caused a harm that only tutoring from a Wilson-certified teacher can remediate. But the plaintiff does not make this argument explicit and does not otherwise provide any reason to think that this is so. Even if the defendant denied the plaintiff compensatory education for almost a year after the ALJ's Order and roughly two months after this court's Order, and even if that gap caused the plaintiff harm and violated this court's Order, the plaintiff has not argued that such a harm would be remedied by the specific relief he seeks.

### B. Quality of Instruction

The plaintiff advances several reasons why William's instruction is inadequate. First, he argues that it is inadequate in principle because only a Wilson-*certified* teacher could adequately deliver the compensatory education, while William's tutor is merely *trained* in the Wilson System. Second, he argues, his instruction is inadequate because his teacher does not follow the Wilson

System and otherwise lacks foundational literacy-teaching knowledge. Third, he argues, he is regressing.

### 1. Wilson-Certification

It is undisputed that William's tutor, Tobey Lee, has been *trained*, but not *certified*, to teach the Wilson System. (Doc. No. 40 at 3; Doc. No. 45 at 4–5.) The plaintiff argues that the training Mr. Lee received would be insufficient for any instructor: "three six-hour days of 'Wilson Intervention Strategies' in-services from CMCSS . . . is insufficient to deliver instruction to a person of William's circumstance." (Doc. No. 40 at 3–4 (citing Doc. No. 40-2 at 2, McAfee Decl. ¶ 7).) The ALJ ordered that William receive "Dyslexia tutoring from a reading interventionist trained to provide Dyslexia tutoring through the Wilson Reading and Language System" (Doc. No. 18-3 at 134, A.R. Vol. 1 at 434) and noted that "CMCSS may provide these services through its employees." (*Id.* at 80, A.R. Vol. 1 at 380 n.2.)[5] This court agreed.[6] (*See* Doc. No. 27 at 29 (noting that the evidence before it did not "suggest[] that CMCSS is categorically incapable of providing the necessary instruction" and that "CMCSS's obligation is to provide the necessary compensatory education through whatever adequate staffing and funding mechanism it chooses").)

In the administrative proceeding, "Dr. McAfee was stipulated as an expert in dyslexia," and her "testimony was credited, having neither been impugned nor rebutted by" CMCSS. (Doc. No. 18-3 at 153, A.R. Vol. 1 at 453.) Dr. McAfee also worked with William about thirty-five times over the course of several months in the beginning of 2023, (*see* Doc. No. 27 at 14; Doc. No. 18-3 at 101, A.R. Vol. 1 at 401), and then "a lot more after that," ending "just before" William began

---

[5] (*See also* Doc. No. 18-3 at 138, A.R. Vol. 1 at 428 ("Dr. McAfee testified that when she recommended CMCSS provide services to meet W.A.'s basic reading skills needs that it could be done '[t]hrough someone in the building.'").)

[6] However, this court "omit[ed] the requirement that the instruction be provided by a 'reading interventionist.'" (Doc. No. 27 at 30 n.6.)

7

tutoring with Mr. Lee in the summer of 2024. (Doc. No. 45-1 at 25, McAfee Dep. at 24:18–25; *id* at 9, McAfee Dep. at 8:14–19). The court is therefore mindful of Dr. McAfee's opinion, both as to dyslexia generally and William's needs specifically. However, there has been no new evidence presented to conclude that William's instructor must be *certified* in the Wilson System to deliver the compensatory education this court ordered, and "certification" was not required by the ALJ or this court.

2. *William's Tutor's Abilities*

In addition to the plaintiff's argument that, in principle, someone with Mr. Lee's Wilson training could not deliver appropriate compensatory education to William, he argues that, in fact, Mr. Lee's teaching is deficient. The court notes at the outset that, even if true, this would not provide a decisive reason to amend this court's Order. The Order required the defendant, not Mr. Lee, to provide compensatory education. (*See* Doc. No. 28 at 1.) Thus, were this court to find Mr. Lee's teaching deficient, the defendant could cure this deficiency with a replacement tutor.

The plaintiff's evidence that Mr. Lee is not up to the job lies in Dr. McAfee's review of several recordings of tutoring sessions with William. (Doc. No. 40-2 ¶ 3.) The parties do not state when the recordings were made, but it was sometime before October 2024. (Doc. No. 45-1 at 6, McAfee Dep. at 5:11–15 ("Q. [Y]ou had those recordings before . . . your October 2024 report, correct? . . . . A. Yes. Probably.").) In Dr. McAfee's opinion, based on those recordings, Mr. Lee does not follow a Wilson lesson plan and, moreover, lacks a "satisfactory working knowledge of the sound-symbol system of English (phonology), the rules that govern English spelling (orthography), and its structure (morphology)." (Doc. No. 40-2 at 4, McAfee Decl. ¶ 10.) In addition, in Dr. McAfee's opinion, Mr. Lee "approached delivering the Wilson instruction to William" with a "lack of fundamental understanding of the Wilson system and seriousness." (*Id.*, McAfee Decl. ¶ 9.)

In response, the defendant recounts Mr. Lee's extensive experience with students and asserts that he "is fully capable of employing" the Wilson System. (Doc. No. 45 at 4 (citing Doc. No. 45-3 at 2–4, Lee Aff. ¶¶ 3–7.) The defendant does not respond to the specific allegations as to Mr. Lee's deficiencies.

### 3. Regression

The plaintiff puts forth two arguments in support of his contention that "William is regressing." (Doc. No. 40 at 4; *see also id.* at 2 ("William is going in reverse.").)

First, the plaintiff states, and the defendant agrees, that William had regressed, as measured shortly after beginning tutoring with Mr. Lee. (*See* Doc. No. 40 at 4–5, (citing Doc. No. 40-2 at 4, McAfee Decl. ¶ 12); Doc. No. 45 at 6 ("McAfee's opinion concerning W.A.'s regression during the period he was not available for tutoring is certainly accurate.").) Indeed, when Mr. Lee began his sessions with William, he "determined that W.A. was below Step 1 in the Wilson system, a significant difference from the Spring 2024 level reported by Sarah McAfee in her October 2024 disclosure." (Doc. No. 45-3 at 3, Lee Aff. ¶ 4.) But the mere fact that William had regressed, at the time he began tutoring with Mr. Lee, does not tell this court much about his current progress or prospects.

Second, Dr. McAfee stated in her February 2025 Declaration that, "[b]ased upon [her] review and listening to William's sessions with Mr. Lee, . . . William has regressed under CMCSS's instruction." (Doc. No. 40-2 at 4, McAfee Decl. ¶ 11.) As the court discussed above, according to Dr. McAfee's recollection, the recordings were made no later than October 2024. Other than the recordings, Dr. McAfee does not "have any information about [William's] work with Mr. Lee," any knowledge of his progress with Mr. Lee, and does not know how many hours of tutoring or how many sessions William has had. (Doc. No. 45-1 at 28, McAfee Dep. at 27:11– 24.)

9

The court cannot credit the plaintiff's outdated claims of regression. To the contrary, and unrebutted by the plaintiff, the defendant has presented evidence of William's "significant progress" through Mr. Lee's Affidavit. (Doc. No. 45 at 6 (citing (Doc. No. 45-3 at 3, Lee Aff. ¶ 6); *see also id.* at 4.) Mr. Lee states that in the 133.25 hours he has worked with William since July 15, 2024, William "has completed the work for Step 5 of the Wilson system." (Doc. No. 45-3 at 3, Lee Aff. ¶ 6.)

### C. Tutoring Hours

The plaintiff argues that William is not timely receiving the tutoring hours this court ordered, both (1) because William's schedule is three days per week, not, as the plaintiff states this court ordered, five and (2) because Mr. Lee regularly cancels appointments.

#### 1. Schedule

However frequently William is in fact currently meeting with Mr. Lee, which the court addresses below, the plaintiff argues that William's current schedule—three days per week— is "untimely" and out of "conformity with" the Order. (Doc. No. 46 at 1–2; *see also* Doc. No. 40 at 5 ("Mr. Lee does not keep hours in conformity with the Order.").) The defendant does not contest that this is the schedule. (*See* Doc. No. 45-3 at 5, Lee Aff. ¶ 9 ("Currently, W.A.'s tutoring sessions follow a schedule of three days each week for 1-1/2 to 2 hours each.").) To be clear, the plaintiff does not contend that William is scheduled to receive too few hours, only that the sessions' frequency violates this court's Order.

The plaintiff describes this court's Order as requiring "1 hour per day, 5 days per week, until 888 hours are reached." (Doc. No. 40 at 3; Doc. No. 46 at 2 (citing Doc. No. 40 at 3).) In neither his Motion nor Reply, however, does the plaintiff cite this court's Order. As set forth above, the Order states, in relevant part:

10

> Insofar as it is reasonably possible, efforts should be made to provide the compensatory education in the form of 5 sessions per week, at 1 hour per session, *but the specific scheduling shall be coordinated to accommodate the schedules of all involved and may, if necessary, depart from that format*.

(Doc. No. 28 at 1 (emphasis added).) In its Memorandum, the court noted that, while it "requires the same compensatory education that the ALJ did," it "will also permit some greater flexibility with regard to scheduling." (Doc. No. 27 at 30 & n.6.) Thus, the mere fact that William receives tutoring three times per week does not render the lessons untimely or otherwise deficient, and this schedule is not inconsistent with the Order.

The plaintiff does not state that the schedule is pedagogically inferior to more frequent, shorter meetings. And, while the record does not reveal how the current, three-day schedule was decided, whose idea it was, or whether the plaintiff objected to it at any point, it *does* contain an October 2024 email correspondence between Mr. Lee and E.A. in which Mr. Lee, "in an effort to confirm meeting times," offers three options, two of which were schedules of meetings five days per week. (*See* Doc. No. 45-3 at 9.) In response, E.A. lists several reasons why William could not, then, commit to a consistent schedule: "fluctuating traffic conditions," the distance from his residence to their meeting spot, and William's work commitments. (Doc. No. 45-3 at 8.)

The court will return to these scheduling issues below. In brief, because some or all of the parties are unable or unwilling to adhere to a flexible schedule, the court will order the parties to design, and stick to, a stricter one.

### 2. Hours

Schedule aside, the plaintiff argues that he is not receiving the court-ordered five hours per week of tutoring because Mr. Lee frequently cancels appointments. (Doc. No. 40 at 2.) From October 2024 through February 2025, the plaintiff states, William received tutoring for only a

11

fraction of the hours he should have. (Doc. No. 40 at 3 (citing Doc. No. 41-1 at 1, E.A. Decl. ¶ 9).)[7] Over those five months, William received, on average, roughly six and one-half hours *per month*, compared to the five hours *per week* ordered. (Doc. No. 28 at 1.)

The defendant does not contest the plaintiff's characterization of William's meetings during the five-month period he describes but states that, since Mr. Lee began working with William on July 15 through the end of March 2025, he had logged 133.25 hours with William. (Doc. No. 45 at 4; Doc. No. 45-3, Lee Aff. ¶ 6.) That is a period of thirty-seven weeks. So, according to Mr. Lee's unrebutted testimony,[8] William and Mr. Lee have been meeting for, on average, roughly 3.5 hours per week. In his Reply brief, the plaintiff states:

> Defendant does not rebut Plaintiffs' motion that the frequency of cancellations for William's tutoring sessions ha[s] been overwhelmingly at the be[h]est of Mr. Lee, not William. (D.E. 40, p. 5). Defendant only offers one week, December 23-31, 2024, *during the Christmas holiday*, in which William was not able to attend tutoring sessions with Mr. Lee. (D.E. 45-3, Lee Aff., ¶ 8). Otherwise, William has been readily available and willing to receive the requisite Wilson tutoring so that he can become a functional reader. Cancellations cause delays, thus untimeliness.

(Doc. No. 46 at 2 (emphasis in original).)

The plaintiff characterizes his Motion as also arguing that the frequency of cancellations is attributable to Mr. Lee. (Doc. No. 46 at 2 (citing Doc. No. 40 at 5).) In his Motion, as to Mr. Lee's cancellations, the plaintiff states only that "Mr. Lee does not keep hours in conformity with the Order." (Doc. No. 40 at 4 (citing Doc. No. 40-1 at 4, E.A. Decl. ¶¶ 8–13).) This could mean that Mr. Lee is not providing the requisite *number* of hours and/or that he is not keeping the requisite

---

[7] October 2024 (3 hours); November 2024 (9 hours); December 2024 (10 hours); January 2025 (4 hours); February 2025 (7 hours). (Doc. No. 40 at 3 (citing Doc. No. 41-1 at 1, E.A. Decl. ¶ 9).)

[8] The plaintiff states that "Mr. Lee claims that since July 2024 he has provided 133.25 hours of instruction (without any corresponding dates of service) to William." (Doc. No. 46 at 2.) But the plaintiff does not argue that Mr. Lee is wrong.

12

*schedule*. The portion of E.A.'s Declaration that the plaintiff cites on this topic has two references to scheduling. In the first, E.A. states that, during the five-month period in which William received too-few hours of tutoring, "the inconsistency in instruction severely impact[ed] William's ability to progress in his reading abilities. Additionally, CMCSS has no backup plan when Mr. Lee is unavailable, further exacerbating the issue." (Doc. No. 40-1 at 3, E.A. Decl. ¶ 10.) E.A. does not state that *Mr. Lee* causes the cancellations or, to the extent she implies as much, what proportion of the meetings he cancels. In the second statement, E.A. states that "William has been required to initiate a phone call on the day of each tutoring session to find out if the tutoring by Mr. Lee will actually occur on that day. This lack of structure and accountability creates further instability in William's learning process." (*Id.* at 4, E.A. Decl. ¶ 12.)

It is not clear, however, whose idea the confirmatory phone call was. In an October 2024 email correspondence between E.A. and Mr. Lee, in response to Mr. Lee's offer of three possible, precise schedules, E.A. notes that "[a]t present, W[illiam] contacts you after finishing work at 4:30 and travels across town to the library." (Doc. No. 45-3 at 8.) E.A. noted that William would be unavailable during the last week of December "due to work commitments," and declined to set a schedule until after "we have W[illiam]'s winter work schedule." (*Id.* at 9.) E.A. also notes that "there have been missed meetings due to various conflicts, including preparations for dinner and your [Mr. Lee's] other family obligations." (*Id.* at 8.)

The defendant does not respond directly to the plaintiff's scheduling claims, but the defendant's exhibits make it clear that it does not share the plaintiff's understanding of the scheduling issues. Taylia Dunbar, CMCSS IDEA specialist, stated that, "since beginning W.A.'s tutoring sessions, my understanding is that instruction has been provided expeditiously with

13

scheduling difficulties only resulting from unforeseen circumstances on behalf of both parties." (Doc. No. 45-2 at 5; Dunbar Aff. ¶ 11.)

Mr. Lee agrees that scheduling "sometimes presents difficulties." (Doc. No. 45-3 at 4, Lee Aff. ¶ 8.) He says this is due in part to William's refusal of his offer to meet at William's home instead of a public library, which is subject to closures and which the plaintiff has stated poses logistical issues. (*Id.* at 4–5, Lee Aff. ¶ 8; *see also id.* at 8 (email from E.A. to Mr. Lee noting the driving distance to, and traffic conditions near, the library).) In addition, Mr. Lee notes that William was unavailable during the last week of December due to work-related issues, while Mr. Lee has cancelled due to inclement winter weather, his own illness, and illness in his family. (*Id.* at 4–5, Lee Aff. ¶ 8.) Each time Mr. Lee has had to cancel, he says, has "been due to appropriate and unforeseeable reasons." (*Id.* at 5, Lee Aff. ¶ 8.) By contrast, he states, "my impression is that W.A.'s priority is earning money, rather than following a designated time for tutoring sessions." (*Id.*)

It is clear that the parties are not meeting with requisite frequency or consistency, though it is unclear who, if any one person, bears primary responsibility. As set forth below, the court will order the parties to design and comply with a strict schedule.

### D.    Contentiousness

Separately, the plaintiff argues that the parties' "contentious" relationship provides a "reason for providing compensatory services outside of the school district" (Doc. No. 46 at 3 (citing *Somberg v. Utica Cmty. Schs*, 908 F.3d 162, 167 (6th Cir. 2018); *see also* Doc. 40 at 5–7), because "[s]topping all these contentious disagreements is plainly necessary for William to learn to read" (Doc. No. 46 at 4–5). The defendant does not respond to this argument.

In *Somberg*, the Sixth Circuit held that the district court did not abuse its discretion by requiring the defendant school district to "pay for compensatory education, rather than ordering

14

[it] to directly provide such education," where the district court "pointed to 'the contentious relationship that ha[d] developed between the parties,'" including, for example, the district's third-party complaint against the plaintiffs' attorney and counterclaim against the student's mother. *Somberg on behalf of Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 176 (6th Cir. 2018).

The relationship between the parties here does not appear to have devolved to that degree. At this point, the court does not find that the parties' disagreements warrant granting the plaintiff's requested relief.

### III. CONCLUSION

Neither the ALJ nor this court ordered compensatory education from an instructor *certified* in the Wilson System or from the Dyslexia Center of Clarksville. The court is not persuaded that modification of the previous Order, in this regard, is justified.

Given the fact that the parties have been unable to "coordinate[] to accommodate the schedules of all involved" (Doc. No. 28 at 1), the court will order five one-hour sessions per week, on a set schedule, not dependent upon varying work hours of William A. And, within fourteen days of the Order, the parties will file a notice with the court of the schedule they have established. It is understandable that emergent and unforeseen circumstances will arise on occasion for both parties, but they should be few and far between, and all parties should strive to adhere to the schedule at all times and to make up missed sessions. Within sixty days, a joint notice will be filed with the court reflecting every cancelled session, who cancelled it, the reason for the cancellation, and whether it was made up. Also within sixty days, the parties must propose an agreed-upon expert to evaluate William A.'s progress, his fees to be evenly split between the parties, unless otherwise ordered by the court.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge